TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section
VICTOR A. RODGERS (Cal. Bar No. 101281)
MAXWELL COLL (Cal. Bar No. 312651)
Assistant United States Attorney
Asset Forfeiture/General Crimes Sections
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2569/1785
    Facsimile: (213) 894-0142/0141
    E-mail: Victor.Rodgers@usdoj.gov
           Maxwell.Coll@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>          v.<br><br>$250,000.00 IN U.S. CURRENCY,<br><br>      Defendant. | Case No. 2:21-cv-07188<br><br><u>COMPLAINT FOR FORFEITURE</u><br><br>18 U.S.C. § 981(a)(1)(A) & (C)<br><br>[FBI] |

    Plaintiff United States of America brings this claim against defendant $250,000.00 in U.S. Currency (the "defendant currency"), and alleges as follows:

JURISDICTION AND VENUE

    1.   The government brings this <u>in rem</u> forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).

2. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395.

## PERSONS AND ENTITIES

4. The plaintiff in this action is the United States of America.

5. The defendant in this action was seized by law enforcement officers on or about March 22, 2021, at U.S. Private Vaults, which is located at 9182 Olympic Boulevard in Beverly Hills, California, and consists of $250,000.00 seized from box 2300 linked to Jaid Gorban and his wife Ksenia Yudina.

6. The defendant currency is currently in the custody of the United States Marshals Service in this District where it will remain subject to this Court's jurisdiction during the pendency of this action.

7. The interests of Jaid Gorban and Ksenia Yudina may be adversely affected by these proceedings.

## BASIS FOR FORFEITURE

Background Regarding U.S. Private Faults

8. U.S. Private Vaults ("USPV") is a company that was in the business of renting safe deposit boxes to customers. By providing and promoting total anonymity, USPV catered to and attracted criminals who sought to keep their identities and the source of their cash beyond the reach of banks, regulators, the IRS, and law enforcement.

9. The company's primary pitch to customers was anonymity, as reflected in its website that provided "Complete Privacy; Biometric Identification; No ID Required." USPV also boasted in its website

1. "Our business is one of the very few where we don't even want to know your name. For your privacy and the security of your assets in our vault, **the less we know the better**." This advertisement appealed to persons engaged in activities which they wished to hide from legal authorities and law-abiding financial institutions.

10. USPV also posted on its website "Four Reasons to Store Your Gold At USPV," information designed to market the company's services, which led to many involved in criminal activities to rent boxes from USPV. The posting asserted:

> Banks require clients to provide their social security
> number and a photo identification as a condition for
> renting a safe deposit box. Your information is then filed
> in the bank's central data system. This information can be
> easily accessed by government agencies (such as the IRS) or
> attorneys armed with court orders. If no one is aware you
> have a safe deposit box, the contents (your gold) are much
> safer.

By advocating a service which circumvented the IRS and persons "armed with court orders," customers engaged in illegal activity were attracted to and ultimately stored and secreted their criminal proceeds (which the government has a legitimate interest in) at USPV, instead of at banks or law-abiding financial institutions where their illegal activities would more likely be uncovered.

/ / /
/ / /
/ / /
/ / /
/ / /

11. In the same post, "Four Reasons to Store Your Gold At USPV", USPV stated:

> As government chartered institutions, banks are now required to file "suspicious activity reports." . . . U.S. Private Vaults is not subject to federal banking laws and would only cooperate with the government under court order.

By marketing services in this fashion, some persons who ultimately became USPV customers, were attracted by the advertisements because USPV's safe deposit box storage facilities offered them a much safer place to store their illegal criminal proceeds, unlike law-abiding banks, so as to eliminate their fear of apprehension by law enforcement and in promotion of their illegal activities.

12. Further, and in order to shield customers from having law enforcement uncover their illegal activity, USPV encouraged its customers pay their box rental fees in cash. In addition, USPV charged customers significantly higher prices than those charged by major banks, because USPV offered something which legitimate banks do not: anonymity, a place to store illegally obtained cash, tips and assistance in avoiding law enforcement and a willingness to look the other way with regard to all types of criminal conduct. And one of USPV's owners has gone so far as to brag about bringing to USPV individuals selling marijuana and other drugs illegally, based on the owner's connections, by marketing USPV as a safe place for those criminal actors and potential USPV customers to store their ill-gotten gains.

13. Not surprisingly, because USPV's business model is designed to appeal and cater to criminals, USPV has repeatedly been used by criminals to store criminal proceeds. Over the years, the contents

4

of specific boxes at USPV have been forfeited because they are the proceeds of criminal activity. For example, on July 1, 2019, officers seized $215,653 from Michael Beaver, as he was leaving USPV, and then seized an additional $1,448,700 from his USPV boxes. Records from the Employment Development Department (the "EDD"), which is the California agency to whom employers must report wages earned by their employees, showed Beaver had no legitimate employment income. In addition, Beaver's phones revealed evidence of drug trafficking activity, and the in excess of $1.6 million funds were forfeited as proceeds of unlawful activity.

14. On April 21, 2019, a victim was kidnapped in San Diego and brutally tortured in a warehouse, where the victim was hit with sticks and baseball bats; stripped naked; hit with a hammer on the victim's toes; and set on fire. Allan Newman was arrested and charged with kidnapping for ransom, attempted murder, torture and aggregated mayhem relative to the beating. The victim had been employed by a group of people who were engaged in distributing counterfeit marijuana vaping cartridges, and the group believed the victim had stolen a suitcase full of cash, which a vape cartridge customer had left at the warehouse. A portion of the funds had been placed by the victim's ex-wife in a safe deposit box at USPV, which the ex-wife retrieved and used to pay the victim's ransom.

15. On March 6, 2018, officers seized $101,080 and 26 gold bars from Vincent Ramos' USPV box. Ramos was the CEO of a company that facilitated the importation, exportation and distribution, internationally, of wholesale quantities of cocaine, heroin and methamphetamine. The currency and gold bars were forfeited, and Ramos was indicted and pleaded guilty to Racketeering and Drug

Trafficking, in the Southern District of California.  See United States v. Ramos, Case No. 18cr1404-WQH.

16. In September 2016, officers seized $592,450 and $435,190, respectively, from two USPV boxes of Mikhail Malykhin, an individual who was the leader of an identity theft/computer intrusion fraud ring.  He and others were involved in a complex scheme involving altering hacked debit cards from a health insurance provider and altering the codes to cash out the debit cards.  Malykhin was indicted and pleaded guilty to committing access device fraud, and the over $1,000,000 in funds seized from Malykhin's boxes were forfeited as proceeds of the fraud and were used to pay restitution to victims of Malykhin's fraud.  See United States v. Malykhin, Central District of California Case No. 16cr0688-DMG.

17. In November 2015, officers seized $1,543,400 from the USPV box of Gerald Lebowitz, which he stated had been brought into the United States illegally to avoid taxes.  However, further investigation revealed that Lebowitz was part of a conspiracy to distribute methaqualone, a controlled substance, and officers seized over 45 kilograms of methaqualone powder and 12 canisters of the chemical o-Taluidine, both chemical precursors, during the course of the investigation.   The funds were forfeited as criminal proceeds.  See United States of America v. Lebowitz, Central District of California Case No. 17cr-0053-CAS.

18. On October 28, 2015, officers seized $500,000, 22 gold bars and 15 gold coins from the USPV box of Cyrus Irani, who was the master bookmaker and head of an illegal gambling organization that operated both internet and traditional bookmaking operations, and engaged in money laundering.  He pleaded guilty to Enterprise

Corruption, and 14 others in his organization were convicted of various gambling, money laundering and enterprise corruption charges. The assets found in Irani's box were forfeited as criminal proceeds.

The Property At Issue In This Case

19. The assets seized from the boxes at issue in this case are examples of persons storing assets from their illegal activity at USPV, as a result of USPV's advertisements, marketing efforts and other transactions and activities over the web, on-line and in the mails, designed to induce persons to rent boxes at USPV to hide their property. The assets seized represent the proceeds of criminal activity and were involved in money laundering activity, which therefore renders them subject to forfeiture.

20. This case pertains to the currency seized from Jaid Gorban's USPV box and is related to the following additional assets seized from boxes at USPV: $1,083,740.00 and miscellaneous precious items seized from boxes 4106 (miscellaneous precious items) and 4704 (currency) linked to Brian Sutton and his wife Samantha Safir; $709,900.00 seized from box 4502 linked to Felix Lantsman and Alla Lantsman (with Asia Verbon listed as executor on the box); and $325,680.00 seized from box 6615 linked to Hershel Tsikman.[1] A criminal felony complaint has been filed against Brian Sutton, Felix Lantsman, Hershel Tsikman, Jaid Gorban and others, in a massive 94-count health care fraud case filed in Santa Clara Superior Court in May 2020. See The People of the State of California v. David Sutton,

---

[1] In addition, the $250,000.00 defendant currency seized from box number 2300, which is the subject matter of this forfeiture action, is the same property plaintiff seeks to have returned in Louis Loe v. United States of America, et al., Case No. 21-cv-03348-RGK-MAR. See Docket No. 53 (second amended complaint ¶¶ 3, 32 and 36, referencing box number 2300).

7

<u>Brian Sutton, Vladimir Tsikman, Hershel Tsikman, Roman Kardonskiy, Jaid Gorban, et al.</u>, Santa Clara Superior Court Case No. C2007796. The charges against these USPV boxholders include violations of the following sections of the California Penal Code: §§ 186.10(a) (money laundering), 487(a)(grand theft of personal property), 530.5(a) (using personal identifying information without authorization), 550(a)(1) (presenting false or fraudulent insurance claim), 550(a)(6) (making a fraudulent claim for health care benefit) and 550(b)(3) (concealing or failing to disclose an event affecting a right to an insurance benefit).  In addition, the charges include violations of the California Business & Professions Code, including §§ 650 (unlawful rebates for patient referrals) and 4324(a) (forgery of a prescription).  The felony complaint against these USPV boxholders sets forth the following information.

21.  Global Marketing Research Group ("Global Marketing") is a call center at the heart of a large-scale state-wide multi-million-dollar criminal conspiracy to commit insurance fraud and money laundering.  When the felony complaint was filed, it was estimated that insurance carriers had been defrauded in amounts exceeding $50,236,000.00, and that the attempted fraudulent billing was more than $75,340,000.00.

22.  Under the direction of Sutton, Tsikman and others, non-medical telemarketers working at Global Marketing made unsolicited calls to individual members of the general public, asking if they would like prescription topical pain cremes or medical braces at no personal cost.  The telemarketers would inundate the general public with telephone calls (sometimes making as many as 30 to 60 calls to a target) seeking insurance billing information, using a script drafted

by Global Marketing's management team.  The calls were designed to induce the victims to order durable medical equipment (DME) or various medicated creams from DME suppliers and pharmacies.  In addition, the Global Marketing management team instructed the telemarketers to use specific personal information to gain the target victims' trust or attempt to confuse the victims into believing the calls originated from the victims' insurance company or doctor's office.  During the calls, the victims were caused by the telemarketers to divulge their personal identifying information, including names, dates of birth, insurance policy information, social security numbers and recent surgeries.

23. The members of the conspiracy facilitated and directed the preparation and submission of fraudulent prescriptions for DME and a variety of paid cremes in multiple ways.  Among other things, the co-conspirators used doctors' personal identifying information without approval for the specific patient; prepared and sent prescriptions to pharmacies without the prescribing doctor communicating with the patient; facilitated the receipt by victims of pain cremes or DME the victims neither wanted nor requested; and facilitated target victims' receipt of products repeatedly even though the victims did not request a refill.

24. Tsikman made separate agreements with individual doctor and doctor groups to sign fraudulent prescriptions, and drafted versions of standardized and easy-to-complete prescription pads for pain cremes and for DME that could be submitted to pharmacies to fill the fraudulent prescriptions.  In addition, Tsikman and Sutton prepared and directed the preparation of fraudulent prescriptions for doctors to approve.  The co-conspirators would pre-prepare fraudulent

1 prescriptions that were later signed by doctors who never
2 communicated with the patient.  In addition, the scheme members would
3 prepare and submit fraudulent prescriptions that were forged using
4 names of doctors who never approved the prescriptions and had not
5 communicated with the target victims.

6     25.  Further, co-conspirators purchased pharmacies (such as
7 boxholder Lantsman, who acquired Van Nuys Pharmacy) that were mutated
8 into mills for fulfilling fraudulent prescriptions for pain creams
9 and DME sold to target victims by Global Marketing.  The mutant
10 pharmacies then billed victim companies tens of millions of dollars
11 in fraudulent prescriptions.  In furtherance of their unlawful
12 activity, the co-conspirators (including Sutton, Gorban and Tsikman)
13 sent large amounts of money via wire transfer in order to promote the
14 carrying on of their illegal activities.

15     26.  In addition to the state proceeding, certain of these
16 boxholders are the subject of an ongoing federal health care fraud
17 investigation.  The investigation, like the state criminal action,
18 pertains to submitting false insurance claims and the submission of
19 those claims to pharmacies.

20                     FIRST CLAIM FOR RELIEF

21     27.  Plaintiff incorporates the allegations of paragraphs 1-26
22 above as though fully set forth herein.

23     28.  Based on the above, plaintiff alleges that the defendant
24 currency constitutes or is derived from proceeds traceable to, or a
25 conspiracy to commit violations of 18 U.S.C. §§ 220 (illegal
26 remunerations for referrals), 1343 (wire fraud) and/or 1347 (health
27 care fraud), each of which is a specified unlawful activity as
28 defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(F) and 1961(1)(B).

The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

29. Plaintiff incorporates the allegations of paragraphs 1-26 above as though fully set forth herein.

30. Based on the above, plaintiff alleges that the defendant currency constitutes property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i) or (a)(1)(B)(i), or property traceable to such property, with the specified unlawful activity being a violation of 18 U.S.C. §§ 220, 1343 and/or 1347. The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF

31. Plaintiff incorporates the allegations of paragraphs 1-26 above as though fully set forth herein.

32. Based on the above, plaintiff alleges that the defendant currency constitutes property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1957(a), or property traceable to such property, with the specified unlawful activity being a violation of 18 U.S.C. §§ 220, 1343 and/or 1347. The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the defendant currency;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

1    (c)  that this Court decree forfeiture of the defendants to the
2 United States of America for disposition according to law; and
3    (d)  for such other and further relief as this Court may deem
4 just and proper, together with the costs and disbursements of this
5 action.

6 Dated: September 6, 2021        TRACY L. WILKISON
                                  Acting United States Attorney
7                                 SCOTT M. GARRANGER
                                  Assistant United states Attorney
8                                 Chief, Criminal Division

9
                                         /s/
10                                VICTOR A. RODGERS
                                  MAXWELL COLL
11                                Assistant United States Attorneys
                                  Asset Forfeiture/General Crimes
12                                Sections

13                                Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

VERIFICATION

I, Lynne Zelhart, hereby declare that:

1. I am a Special Agent with the Federal Bureau of Investigation.

2. I have read the above Complaint for Forfeiture and know the contents thereof.

3. The information contained in the Complaint is either known to me personally, was furnished to me by official government sources, or was obtained pursuant to subpoena. I am informed and believe that the allegations set out in the Complaint are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 5, 2021 at Los Angeles, California.

/s/ *Lynne Zelhart*
Lynne Zelhart